

2004 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

3-23-2004

# USA v. Worley

Precedential or Non-Precedential: Non-Precedential

Docket No. 03-2103

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

Recommended Citation

"USA v. Worley" (2004). *2004 Decisions.* Paper 923.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/923

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

———

NO. 03-2103

———

UNITED STATES OF AMERICA

v.

BONITA WORLEY,
Appellant

———

NO. 02-3874

———

UNITED STATES OF AMERICA

v.

DAVID H. BROWN, II,
Appellant

———

On Appeal from the United States District Court
for the District of Delaware
(D.C. Crim. Nos. 01-cr-00065-2, 01-cr-00065-1)
District Judge: Hon. Gregory M. Sleet

———

Submitted Under Third Circuit LAR 34.1(a)
March 8, 2004

Before: SLOVITER and NYGAARD, <u>Circuit Judges</u>,
and OBERDORFER, <u>District Judge</u>\*

(Filed:  March 23, 2004)

_____

OPINION OF THE COURT

SLOVITER, <u>Circuit</u> <u>Judge</u>.

Appellants Bonita Worley and David Brown appeal from their respective convictions and sentences.  They were each indicted for one count of conspiracy to commit mail fraud under 18 U.S.C. § 371, two counts of mail fraud under 18 U.S.C. § 1341, one count of transportation of stolen property under 18 U.S.C. § 2312, one count of money laundering under 18 U.S.C. § 1956(a)(1)(B)(i), and one count of conspiracy to commit laundering of monetary instruments under 18 U.S.C. § 1956(h).

On May 28, 2002, a jury convicted Worley on all counts except one count of mail fraud and one count of transportation of stolen property, and convicted Brown on all counts except one count of transportation of stolen property.  Worley was sentenced to four concurrent terms of 37 months imprisonment followed by three years of supervised release, a $400 special assessment, and joint and several liability for restitution in the

_____

\*      Hon. Louis F. Oberdorfer, United States District Court for the District of
        Columbia, sitting by designation.

2

amount of $90,775. Brown was sentenced to five concurrent terms of 41 months imprisonment followed by three years of supervised release, a $500 special assessment, and joint and several liability for restitution in the amount of $90,775.

We have jurisdiction to hear these appeals under 28 U.S.C. § 1291. We will affirm.

## I.

Inasmuch as we are writing solely for the parties and the District Court, we will recite only those facts necessary in deciding this appeal. Brown became the campaign manager for Wilmington's former Mayor James H. Sills during the 1996 election. Following Sills's election, Brown became the executive director of the Wilmingtonians, an organization created to address social issues and provide solutions for Wilmington citizens. The City owned all company property.

Thereafter, Brown became president of the organization, and in this capacity was responsible for its daily operations including maintaining control over the finances and any mail containing checks payable to the Wilimingtonians. Worley performed as a Community Outreach Specialist for the organization. The indicted charges arise largely out of four incidents.

First, on April 20, 2000, the Wilmingtonians submitted an invoice for $1,160 to the Census Bureau for work they had done, but Brown endorsed the check issued by the U.S. Treasury to the Wilmingtonians over to Worley, who deposited the full amount in

her personal checking account. Neither appellant disclosed to the Wilmingtonians' accountant that this money had been converted.

Second, on October 4, 2000, the Wilmingtonians paid $3,850 to Bowling Green of Brandywine, a drug and alcohol treatment facility, for treatment of Worley's drug problems. Worley completed only one day of treatment, and the facility sent a refund check in the amount of $3,575, payable to David Brown in care of the Wilmingtonians. Brown deposited the refund check into Worley's personal checking account, and Worley signed a check for $3,350 to Brown from her account.

Third, when Sills lost the 2000 election, Mayor James Baker took office in January 2001 and advised the Wilmingtonians that the City would not send additional funds, required the return of all property (including motor vehicles), and intended to audit the company's finances. Despite the impending financial collapse of the Wilmingtonians, Brown wrote Worley a $56,000 check from the Wilmingtonians' account, ostensibly as a "consulting fee." Various steps were taken to create the appearance of propriety. In the following weeks, Worley wrote a substantial number of checks from her personal account, including several to "cash" and a check to Brown in the amount of $1,600.

Finally, Brown purchased a 2001 Suburban on behalf of the Wilmingtonians, valued at approximately $30,000. In January 2001, Brown and Worley orchestrated an allegedly sham sale of the vehicle to Worley's unsuspecting stepfather, Robert Starling, for $100, unbeknownst to the Wilmingtonians' Board of Directors. On January 31, 2001,

4

Brown and Worley accompanied Starling to trade the vehicle in for a 1997 Range Rover (a type of Land Rover). Brown negotiated the trade. Worley paid the difference of $4,149.25 with money drawn from her account in which the $56,000 consulting fee had been deposited the day before, telling Starling the money was a gift to him. Starling drove the vehicle on two occasions before giving Worley possession of it. Brown and Worley drove the vehicle for over 300 miles during the period between January 31 and February 9. As of the Board of Directors meeting on February 13, 2001, the whereabouts of the Suburban were unknown, and the Board was unaware that it had been sold.

Following Worley's conviction, the District Court placed her on twenty-four hour home confinement, with electronic monitoring, pending sentencing in this case. Electronic monitoring began on August 30, 2002, and Worley's sentencing was to take place on October 2, 2002. However, on September 19, 2002, she cut off her electronic monitor and fled her home detention, allegedly in an attempt to find her daughter, who had run away, and to place her in a safe home. The probation office was unable to locate Worley until she surrendered to the U. S. Marshal's Service on September 24, 2002. The District Court conducted a revocation of bail hearing on October 2, 2002, and sentenced Worley on December 19, 2002.

## II.

### A. Bonita Worley

Worley makes three arguments on appeal. First, she appeals from her judgment of

conviction, arguing that requiring co-defendant Brown to speculate about whether some of the Government's witnesses were lying was improper and not harmless error. Second, she appeals from her sentence, arguing that the District Court improperly attributed the value of the Suburban to her for the purpose of sentencing. Third, she argues that the District Court erred in enhancing her sentence for obstruction of justice.

*1. Whether requiring Brown to speculate about the credibility of other witnesses constitutes reversible error for Worley's conviction.*

Worley objects to questions asking Brown whether other witnesses had lied, such as, "So Mike Harris was lying when he said that you never discussed money with him?" Worley's App. at 872.[1] Worley also objects to the following excerpts from the Government's summation: "[H]e told you that all of the witnesses the Government called either got it wrong or lied on the stand when they testified differently from what he said happened." Worley's App. at 966. "Mike Harris lied on the stand, according to Mr. Brown. Robert Starling lied on the stand, according to Mr. Brown. Clarence White,

---

[1]    The full list of questions to which Worley objects is as follows: (1) "So Mike Harris was lying when he said that you never discussed money with him?" Worley's App. at 872; (2) "So Mike Harris gets everything wrong. So far, we established Mike Harris gets everything wrong about what you say and the News Journal gets everything wrong about what you say; right? That's where we are right now." Worley's App. at 873; (3) "So we can add Clarence White to the list with Mike Harris of people who lied on the stand?" Worley's App. at 874; (4) "So we have the newspaper gets it all wrong, Mike Harris has it all wrong, Clarence White gets it all wrong. When it comes down to David Brown, Clarence White lies on the stand and Mike Harris lies on the stand?" Worley's App. at 874; (5) "We're going back to the list of all the people who got the wrong date. Brown does and now Robert Starling got it wrong, too; right?" Worley's App. at 892; (6) "Mr. Wennagel from the Land Rover dealership, he got it wrong when he said the [time] was earlier in the day as well." Worley's App. at 893.

6

Maimouna M'Backe, Bunny Miller and Mr. Kakoma all either lied on the stand or just got it wrong." Worley's App. at 967. These questions and summation remarks highlight the irreconcilable testimonial pictures painted by several witnesses and Brown, but Worley argues it is reversible error to ask a defendant (or here, a co-defendant) to testify regarding the credibility of other witnesses.

Worley contends that we have plenary review over this issue because it is a legal one involving Federal Rules of Evidence 601 and 602. United States v. Mitchell, 145 F.3d 572, 576 (3d Cir. 1998). The Government contends that because the scope of cross-examination is left to the discretion of the trial court, we should review for an abuse of discretion. United States v. Irizarry, 341 F.3d 273, 306 (3d Cir. 2003). It is not necessary to choose in this case because both parties agree that, assuming that an abuse of discretion or a legal error occurred, the evidentiary ruling should be subject to harmless error analysis. We have defined non-constitutional harmless error as "highly probable that the error did not contribute to the judgment." United States v. Gambone, 314 F.3d 163, 177-78 (3d Cir. 2003) (internal quotation and citations omitted). "High probability requires that the court possess a sure conviction that the error did not prejudice the defendant." Id. (internal quotation and citation omitted).

Other courts of appeals have denounced this type of questioning. The Court of Appeals for the Second Circuit noted that questions asking the defendant to testify whether another witness was either mistaken or lying constituted "improper cross-

7

examination." United States v. Richter, 826 F.2d 206, 208 (2d Cir. 1987); see also Lamar v. Graves, 326 F.3d 983, 987 (8th Cir. 2003) ("[W]e do not necessarily condone the questions posed to Mr. Lamar . . . ."); United States v. Geston, 299 F.3d 1130, 1136-37 (9th Cir. 2002) ("[I]t was plain error for the court to allow the prosecutor to persist in asking witnesses to make improper comments upon the testimony of other witnesses."); United States v. Sullivan, 85 F.3d 743, 749-50 (1st Cir. 1996) ("[W]e state the rule now emphatically: counsel should not ask one witness to comment on the veracity of the testimony of another witness"); United States v. Boyd, 54 F.3d 868, 871 (D.C. Cir. 1995) ("It is therefore error for a prosecutor to induce a witness to testify that another witness, and in particular a government agent, has lied on the stand."); United States v. Williamson, 53 F.3d 1500, 1523 (10th Cir. 1995) (noting that cross examination was "confrontational and abrasive").

In only three of the six instances of objected-to questioning in this case did the Government ask co-defendant Brown whether a witness was lying, specifically whether Mike Harris and Clarence White were lying. In the other three instances, the prosecution asked whether another witness had gotten things wrong. The Second Circuit has stated, "Asking a witness whether a previous witness who gave conflicting testimony is 'mistaken' highlights the objective conflict without requiring the witness to condemn the prior witness as a purveyor of deliberate falsehood, i.e., a 'liar.'" United States v. Gaind, 31 F.3d at 73, 77 (2d Cir. 1994). Therefore, we conclude that only the cross-examination

8

of Brown regarding the testimony of Harris and White was improper.

Although the cross-examination and summation statements were improper, they amount to harmless error. As noted by the First Circuit, because inconsistencies in testimony are apparent, "[p]ointing out the obvious most likely scored the government, at most, rhetorical points." Sullivan, 85 F.3d at 750. This is especially true here when the government called nine witnesses other than White and Harris to testify about the varying criminal events, and entered numerous exhibits into evidence.

"The 'was-the-witness-lying' question . . . should never have been posed. . . . We expect that the office of the United States Attorney and other counsel will abide by the rule." Sullivan, 85 F.3d at 750 (internal quotation and citation omitted). In the instant case the impropriety was harmless and we will not overturn the conviction on this ground.

*2. Whether the District Court erred in attributing the value of the Suburban to Worley for purposes of sentencing.*

We review a district court's fact findings for clear error, and the interpretation and application of the sentencing guidelines under a plenary standard. United States v. Brennan, 326 F.3d 176, 200 (3d Cir. 2003). The District Court did not err in attributing the value of the Suburban to Worley for purposes of sentencing.

Worley was acquitted of one count of mail fraud and one count of transportation of stolen property – both relating to the acquisition of the Suburban – but she was convicted of the conspiracy to commit mail fraud. The indictment expressly included the events concerning the acquisition of the Suburban in this conspiracy count. As the District Court

9

noted, "The fact that the jury acquitted Ms. Worley of a substantive mail fraud charge does not undermine its conclusion that she conspired to commit mail fraud with her codefendant, Mr. Brown, as the elements of those two charges are different." Worley's App. at 1123. It was therefore proper under U.S.S.G. § 2B1.1 to attribute the value of the Suburban to Worley.

The District Court also found that the value of the Suburban could be attributed to Worley under the relevant conduct guideline, U.S.S.G. § 1B1.2. The Supreme Court has made clear that an acquittal on a charge does not prevent a court from considering the underlying conduct as relevant conduct so long as it has been proven by a preponderance of the evidence. United States v. Watts, 519 U.S. 148, 154 (1997). In explanation of Worley's sentence, the District Court stated, "The steps Ms. Worley took to acquire the Suburban were done during the same month in which they also took steps to fraudulently acquire the $56,000 check. A portion of that money was used to complete the money laundering transaction involving the Suburban. Moreover, Ms. Worley was involved at every stage of the scheme to acquire and dispose of the Suburban. Finally, she ultimately maintained control over access to the Range Rover." Worley's App. at 1124. A preponderance of the evidence supports this conclusion, including the testimony of Starling, Worley's stepfather who purchased the Suburban for $100 and traded it in for a Land Rover, and Wennagel, the salesman at the Land Rover dealership. See App. at 62-65.

10

For these reasons, the District Court did not err in attributing the value of the Suburban to Worley for purposes of sentencing.

*3. Whether the obstruction of justice enhancement was properly applied to Worley.*

Worley cut off her electronic monitoring device on September 19, 2002, and effectively disappeared until September 24, 2002, at which time she turned herself in to the U. S. Marshal's Service. Worley contends that she did not intend to obstruct the administration of justice but was only seeking to find her daughter and place her in a secure location. We review a district court's findings of fact for clear error, and the application of sentencing guidelines under a plenary standard. Brennan, 326 F.3d at 200.

Section 3C1.1 of the sentencing guidelines provides a two-level enhancement if "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the course of the . . . sentencing on the instant offense . . . ." Among the examples of conduct to which this guideline is applicable is "escaping or attempting to escape from custody before trial or sentencing." U.S.S.G. § 3C1.1 (Commentary 4(e)). See United States v. Abuhouran, 162 F.3d 230, 234 (3d Cir. 1998) ("[W]e find [defendant's] bold breaking of the bracelet and brazen trip to Kennedy to be a very serious obstruction of justice."). Even assuming Worley did not intend to disguise her whereabouts from the Marshals, the cutting of her electronic monitoring device was purposeful, and the guideline commentary assumes that an escape or attempted escape is willful. See United States v. Swanson, 253 F.3d 1220, 1223 (10th

11

Cir. 2001) ("[Defendant's] motivations are beside the point . . . the only significant question is whether he willfully fled custody."). Even if Worley was concerned about her daughter's safety, she could have informed the Marshal's Service and secured the help of law enforcement, friends, or family, instead of choosing to escape custody. The argument that Child Protective Services had closed the file on her children such that asking them for help would have been futile is unconvincing.

In any event, the District Court's conclusion that her explanation is unsupported by the record was not plain error. Accepting the proffer that her daughter would testify to events that corroborate Worley's testimony, the District Court noted that "in spite of that, let me say that there were two probation officers at the hearing who testified she made no effort to contact the Probation Office and advise them of Cami's situation and her need to leave the home to help her." Worley's App. at 1143. Also, Cami Worley did testify at the bail revocation hearing held on October 2, 2002, after the electronic monitoring incident. During that hearing, Cami testified that she left the house after a fight with her grandmother, but she did not testify that her mother came to look for her, found her, and placed her in a secure home. The District Court noted at the sentencing hearing that Cami's failure to testify that her mother came to look for her was "an important oversight" that "wouldn't have required . . . a question to be put specifically" as Worley's counsel suggested. Worley's App. at 1136-37.

Because the District Court was entitled to conclude that Worley's explanation of

her escape was unconvincing, and because Worley's explanation, even if true, would not undermine the applicability of the obstruction of justice enhancement, we will affirm the sentence imposed by the District Court.

**B. David Brown**

Brown challenges both his judgment of conviction and his sentence. He argues that there was insufficient evidence to convict him on the money laundering counts and that the District Court erred in enhancing his sentence for an abuse of trust.

*A. Whether the evidence was sufficient to support the verdict on the money laundering counts.*

Brown argues that because sale of the Suburban was traceable, money laundering did not occur. We apply a "particularly deferential" standard of review when deciding whether a jury verdict rests on legally sufficient evidence. United States v. Dent, 149 F.3d 180, 187 (3d Cir. 1998).

There are four essential elements of money laundering under 18 U.S.C. § 1956(a)(1)(B)(I): (1) a financial transaction; (2) involving proceeds of specified unlawful activity; (3) knowledge that the transaction involves proceeds of some unlawful activity; and (4) knowledge that the transaction was designed in whole or in part to conceal or disguise the nature, location, source, ownership, or control of the proceeds. United States v. Omoruyi, 260 F.3d 291, 294-95 (3d Cir. 2001). Applying these elements, the evidence adduced was sufficient to support the verdict.

The sale of the Suburban for $100 to Starling completed a phase of the ongoing

offense.  See id. at 295.  The automobile was then immediately converted into a Land Rover, ostensibly under Starling's ownership, to obscure the fact that the true owner was still Brown.  This transaction was funded partly through the illegal conversion of the Suburban and partly through the $56,000 sham consulting fee provided to Worley.  Thus there was a financial transaction, funded through unlawfully procured funds with the knowledge that the funds were unlawfully procured, that was designed to conceal the nature of the proceeds.

In light of the evidence and the particularly deferential standard of review, we agree with the District Court that there was sufficient evidence to support the conviction.

*B.  Whether the District Court erred in enhancing Brown's sentence for an abuse of public or private trust.*

We review a district court's findings of fact for clear error and its application of the sentencing guidelines under a plenary standard.  Brennan, 326 F.3d at 200.  The District Court overruled Brown's objection to the abuse of trust enhancement, concluding, "[a]bsent his position as President of The Wilmingtonians, and his day-to-day authority to engage in legitimate transactions on behalf of the organization he would not have been able to accomplish the fraudulent transactions at issue."  Brown's App. at 895. Brown argues that because his criminal activity required no special skills and was not difficult to detect, it was not an abuse of trust.

Section 3B1.3 of the sentencing guidelines states, "If the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly

14

facilitated the commission or concealment of the offense, increase by 2 levels." We have held that

> in considering whether a position constitutes a position of trust for purposes of § 3B1.3, a court must consider: (1) whether the position allows the defendant to commit a difficult-to-detect wrong; (2) the degree of authority which the position vests in the defendant vis-a-vis the object of the wrongful act; and (3) whether there has been reliance on the integrity of the person occupying the position.

United States v. Pardo, 25 F.3d 1187, 1192 (3d Cir. 1994). We have also noted that the "rationale for increased punishment is that an insider who takes advantage of a position of trust to facilitate a crime is thought to be more culpable than one who simply commits the offense." Id. at 1191 (quotation and citation omitted) (emphasis in original).

It is plain that under this analysis, the District Court did not err in concluding that Brown abused the public trust. The wrong was difficult to detect because Brown was responsible for the daily financial operations of the organization, and the Wilmingtonians' accountant relied directly on the materials he received from Brown in order to keep the books. That Brown exercised a high degree of authority is plain from his position as President. Placement of him in the position as President where he controlled the group's finances necessarily implies reliance on his integrity.

Brown's argument that no special skills were required is of no moment, because Section 3B1.3 is written in the disjunctive, and the only clause at issue is the "abuse [of] a position of public or private trust" phrase. Furthermore, Brown's argument that the crime

15

was not difficult to detect is unpersuasive because he specifically disguised the conversions in such a manner that did make them difficult to detect. We will affirm the ruling of the District Court.

## CONCLUSION

We will affirm the convictions and sentences of appellants Worley and Brown.